## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Kenneth J.V.,                                                            Case No. 22-cv-373 (KMM/DJF)

                    Plaintiff,

v.

                                                                **REPORT AND RECOMMENDATION**

Kilolo Kijakazi,
Commissioner of Social Security,

                    Defendant.

---

### I.    Introduction

Plaintiff Kenneth J.V. contests the Commissioner of Social Security's denial of his application for supplemental security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. § 1381, et seq.  This matter is before the Court on the parties' cross-motions for summary judgment (ECF Nos. 17, 19), Plaintiff's Motion to Remand (ECF Nos 24), and the parties' supplemental motions for summary judgment (ECF Nos. 29, 31). The parties dispute whether the Administrative Law Judge ("ALJ") properly explained why he did not incorporate a limitation of "superficial" contact with supervisors and coworkers into the Residual Functional Capacity ("RFC") assessment, and if the ALJ did commit error, whether that error requires remand. **The undersigned considers the motions and issues this report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.1.**  For the reasons set forth below, the Court recommends Plaintiff's Motion for Summary Judgment (ECF No. 17) and Supplemental Motion for Summary Judgment (ECF No. 31) be denied; Plaintiff's Motion to Remand (ECF No. 24) be granted; and Defendant's Motion for Summary Judgment (ECF No. 19) and Supplemental Motion for Summary Judgment (ECF No. 29) be denied.

1

## II.    Procedural History

Plaintiff applied for both disability insurance benefits ("DIB") and SSI on December 19, 2019 (Tr. 254, 261),[1] originally alleging his disability began on October 18, 2013 due to, among other impairments, a shoulder injury, brain injury, depression, and anti-social personality disorder. (*See* Tr. 26, 45.) Defendant denied Plaintiff's applications both initially (Tr. 110–11), and on reconsideration (Tr. 154–55).

Plaintiff then requested a hearing before an ALJ.  The ALJ held the hearing on March 4, 2021, during which Plaintiff was represented by a non-attorney representative (Tr. 45).  At the hearing, Plaintiff amended his alleged onset of disabilities date to October 28, 2019—thereby withdrawing his Title II DIB claim and proceeding only on the Title XVI SSI claim (Tr. 47). The ALJ issued his decision holding that Plaintiff is not entitled to SSI on April 21, 2021 (Tr. 36–37). Plaintiff sought review of the ALJ's decision from the Appeals Council, which denied his request on December 15, 2021 (Tr. 1), making the ALJ's decision the Commissioner's final determination.

Plaintiff timely filed this action challenging the agency's decision on February 8, 2022 (ECF No. 1).  The parties filed cross-motions for summary judgment in June 2022 (ECF Nos. 17, 19).  In August 2022, Plaintiff filed a Notice of Supplemental Authority and Motion to Remand (ECF No. 23, 24) in light of the administrative order issued in an unrelated case, *In re Paul K.B.* (*see* ECF No. 26), which the Appeals Counsel issued in July 2022.  The Court ordered supplemental briefing (ECF No. 29), and the parties filed supplemental motions for summary judgment (ECF Nos. 29, 31) in light of that decision. This matter is now ready for determination on the parties' written submissions.

---

[1] For ease of reference, the Court cites to the Administrative Record (ECF No. 16) by record page number ("Tr.") instead of using docket citations.

### III.     Plaintiff's Mental Health History

The record reflects Plaintiff suffers from a wide range of physical and mental impairments. For purposes of this action, however, the Court focuses solely on Plaintiff's mental health history and the agency findings regarding his mental health impairments, which are central to Plaintiff's claims.

Plaintiff has intermittently obtained therapy for mental health issues with varying degrees of regularity from 2013 to November 2020 (*see* Tr. 394–579).  In 2014, Plaintiff attended therapy reporting emotional struggles related to a recent breakup (Tr. 395).  As recounted by his therapist, he reported symptoms consistent with an adjustment disorder with depressed mood, and his previous behaviors and criminal history were consistent with antisocial personality disorder. (*Id.*)

In 2016, Plaintiff indicated in treatment that he had experienced childhood trauma—in particular, physical and emotional abuse from his father (Tr. 488).  He noted he had Prozac and Vistaril prescriptions, but he did not take those medications regularly. (*Id.*)  While he was generally sober, he had relapsed a few times with alcohol and methamphetamine, and he reported previous marijuana and cocaine addictions. (*Id.*) He also reported several previous head injuries stemming from multiple incidents, including a bicycle accident when he was 16 years old, a motorcycle accident when he was 27 years old, a physical assault in 2006, and a motorcycle accident in 2014. (*Id.*) After the bicycle accident he experienced a brief loss of consciousness, but his neurological exam was normal. (*Id.*)  He lost his memory for about a week after the first motorcycle accident. (*Id.*)  He lost his memory for about a month after the assault, which required facial reconstructive surgery. (*Id.*)  And after the most recent motorcycle injury, he lost his memory for about an hour. (*Id.*)

In formal testing in 2016, Plaintiff demonstrated a poor ability to retain information and remain attentive, but he exhibited minimal depression (Tr. 490–91).  His testing also indicated antisocial tendencies, such as impulsivity, a poor ability to consider the consequences of his actions, unreliability, insensitivity and irritability (Tr. 491).  Testing further indicated anxiety symptoms such as restlessness, tenseness and difficulty relaxing. (*Id.*)  His scores further indicated a mild cognitive disorder consistent with a traumatic brain, substance abuse, or neuro-developmental disorder. (*Id.*) The test results warranted a continued diagnosis of major depressive disorder-mild, anti-social personality disorder with dependent, narcissistic and histrionic traits, and potential anxiety disorder. (*Id.*)  Later that year, Plaintiff reported struggles sleeping—indicating that, although he stayed in bed for about 12 hours each night, he only slept for six to seven hours (Tr. 499).  At that time, his doctor increased Plaintiff's Prozac dose, discontinued his Vistaril prescription, and trialed a course of Mirtazapine for sleep (Tr. 500).

Plaintiff did not return to formal counseling until October 2019, at least in part because he was incarcerated from 2018-2019 (Tr. 501).  He reported a worsening state of depression since leaving prison and continuing problems with sleep and anxiety. (*Id.*)  He noted that the medications he had been on in the past were somewhat helpful, although he was generally noncompliant with his prescription protocol (*Id.*)  At that time he was not on medication, and his mental health provider[2] prescribed Remeron for sleep and Wellbutrin for mood (Tr. 502).

At a November 2019 follow-up visit Plaintiff indicated he had stopped taking Wellbutrin because it made him anxious (Tr. 504).  He reported his mood had slightly improved to a "standard

---

[2] In October 2019 Plaintiff began receiving treatment from a psychiatric mental health nurse practitioner (PMHNP).

depression" level and that his overall level of anxiety remained unchanged (Tr. 504). His mental health provider started him on a prescription for Lexipro at that time (Tr. 505).

In December 2019, he reported that Lexipro may be having at least some positive effect and that he was generally sleeping well. He said he continued to experience low energy and motivation and flat moods, however. He also complained he was experiencing repeated headache episodes, which at that time he did not attribute to the Lexipro (Tr. 507).

In January 2020, he reported similar symptoms and his mental health provider increased his Lexipro dosage. In February 2020, Plaintiff suggested that the increase in Lexipro had resulted in an increase in headache episodes (Tr. 513). He explained that he manages his headaches by taking Ibuprofen and sleeping throughout the day (Tr. 513). In response, his mental health provider terminated his Lexipro prescription and prescribed Zoloft instead (Tr. 514). In June 2020, he indicated he was sleeping well after an increase in his Remeron dosage, but he was continuing to have debilitating headaches one to two times per week (Tr. 521). Though he felt somewhat less depressed, he continued to lack energy and motivation, felt hopeless and worried constantly. His testing indicated he was in a state of moderate depression (Tr. 521, 526–27). In August of that same year, he noted an improvement in his mood. He reported feeling well and happy, had good energy, was more motivated, was eating well and remained connected to his parents (Tr. 540). His mental health took a turn for the worse in November 2020, however, when he reported worsening depression, low energy and angry feelings (Tr. 537). Later that month he saw a psychiatrist, who tested Plaintiff and diagnosed intermittent explosive disorder and dysthymia, as opposed to major depressive disorder (Tr. 559).

IV.    **Administrative Findings**

a.  **Initial Review**

On May 4, 2020, at the initial claim level, Psychological Consultant Gale Sargeant assessed Plaintiff's mental residual functional capacity ("MRFC") (Tr. 104-07). She determined, with respect to his social interaction limitations, that he is moderately limited in his ability to interact with the general public; not significantly limited in his ability to ask simple questions or request assistance; moderately limited in his ability to accept instructions and respond appropriately to supervisor criticism; moderately limited in his ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and not significantly limited in his ability to maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness (Tr. 106).

With respect to Plaintiff's adaptation limitations, Dr. Sargeant found he is moderately limited in his ability to respond appropriately to changes in the work setting; not significantly limited in the ability to be aware of normal hazards and take appropriate precautions; not significantly limited in his ability to travel in unfamiliar places or use public transportation; and not significantly limited in his ability to set realistic goals or make plans independently of others (Tr. 106-07).

Dr. Sargeant concluded that Plaintiff "retains sufficient mental capacity to remember and perform work tasks with adequate concentration, persistence and pace. [He] is capable of working independently with *superficial* interactions with supervisors, coworkers and the public. [He] has the capacity to respond appropriately in an environment that has occasional workplace changes." (Tr. 107, emphasis added.)

Based on the assessments conducted, including Dr. Sargeant's MRFC assessment, the agency determined on initial review that Plaintiff was not disabled given his age, education and residual functional capacity. The agency specifically determined he could adjust to other work, including call-out operator, matrix inspector and surveillance system monitor (Tr. 113).

### b. Reconsideration

Psychological Consultant Kathleen Feil examined Plaintiff's MRFC at the reconsideration level on September 1, 2020 (Tr. 126–31). Her findings were consistent with Dr. Sargeant's findings with respect to Plaintiff's social interaction and adaptation limitations (Tr. 130). She further agreed with Dr. Sargeant's conclusion that Plaintiff is capable of working independently with "superficial" interactions with supervisors, coworkers, and the public, and that he "has the capacity to respond appropriately in an environment that has occasional workplace changes." (*Id.*) Dr. Feil disagreed with Dr. Sargeant's findings in one respect, however. Based on her review of the results of neuropsychological testing, Dr. Feil determined Plaintiff had impairments in memory, attention and concentration, which were not noted on initial review. (Tr. 130-31.) She concluded Plaintiff would be markedly impaired if required to engage in activities that required him to engage in more than repetitive and 3–4 step uncomplicated instructions, and that he could not perform detailed or complex technical tasks. (*Id.*)

Based on the assessments conducted on reconsideration, including Dr. Feil's MRFC assessment, the agency affirmed the determination on initial review that Plaintiff was not disabled given his age, education and residual functional capacity. The agency further affirmed the finding that he could adjust to other work, including call-out operator, matrix inspector and surveillance system monitor (Tr. 155-56).

### c.  The ALJ Hearing

In response to the agency's decision on reconsideration, Plaintiff sought administrative review by the administrative law judge ("ALJ").  *See* 42 U.S.C. § 405(b)(1); 20 C.F.R. § 404.929. On March 4, 2021, Plaintiff appeared for the hearing remotely with his non-attorney representative, with Vocational Expert ("VE") Ashley Bryars present for questioning (*see* Tr. 44–75).  Plaintiff explained he had previously worked as an assembler for a temperature specialist company, as a factory worker (though he did not make it through training) and as a forklift driver, but said he had not worked since 2013 (Tr. 50–52).  He was not looking for a job and did not meet with Vocational Rehabilitation to seek any job retraining (Tr. 52).

He testified he has difficulty remembering things he reads, but he can write, do simple math and manage his own money (Tr. 49–50).  He attributed his memory issues, which are primarily short-term memory issues, to his traumatic brain injuries (Tr. 55).  When he has medical appointments, he needs his mother to remind him of the date and time (Tr. 56).  He struggles with concentration (Tr. 57).  He cannot watch a full movie and has difficulty finishing a 30-minute television show. (*Id.*)  He has headaches approximately every other day, resulting in pain that is a six to eight on a scale of one to ten, which require him to take three to four ibuprofen tablets at a time and lie down (Tr. 58–59).  These headaches do not go away unless he falls asleep for a long, roughly two-hour, nap. (*Id.*)  At the time of the hearing, he was taking Depakote and Mirtazapine, which helped with his ability to sleep better and decreased his irritability (Tr. 65), but said he needed to keep his medications by his bedside and would forget to take them otherwise (Tr. 55–56).

Plaintiff testified that he is both depressed and anxious (Tr. 59–60).  He is tired, sad, cries, and generally lacks motivation, but he does not have suicidal thoughts (Tr. 60).  He generally

sleeps a lot and eats too little (Tr. 61). He has bursts of irritability and rapid mood changes (Tr. 62). His anxiety can be overwhelming, ranging from worries about his kids to what others are thinking about him and his future (Tr. 61). Plaintiff said he can quickly become angry in moments of high anxiety—for example, if he is at work and becomes worried that he did not do something correctly and is concerned about what others think of him (Tr. 61-62). He further explained that sometimes he finds it difficult to understand instructions from other people and gets in trouble for not following them correctly. These situations can lead to angry outbursts (Tr. 68).

Plaintiff's anger can escalate quite significantly—to the point where he has yelled and thrown things at people (Tr 62). He testified he had been to jail "a lot" for domestic incidents related to his anger outbursts (Tr. 62). He said he had been sober since 2017 (Tr. 63) and was in counseling, but he was transitioning between doctors (Tr. 65).

During the hearing, the ALJ asked VE Bryars to address the following hypothetical with respect to mental health limitations:

> Mentally the hypothetical individual is able to understand, remember, and carry out only short, simple, routine, and repetitive instructions. He is able to sustain concentration, persistence, and pace for such level of instruction for a period of two hours at a time assuming normal work breaks. He is able to interact with supervisors and coworkers up to an *occasional basis* but should have no customer service interactions with the public. He is able to respond appropriately to changes in a routine work setting as long as those changes are infrequent and gradual in nature. And then lastly he's able to make judgments on only simple work related decisions.

(Tr. 71) (emphasis added.)

Ms. Bryars determined that these mental limitations, along with Plaintiff's physical limitations, rendered Plaintiff unable to perform his previous work (Tr. 71-72). When asked whether there would be "unskilled, medium, or light jobs that would fall within the parameter of the above hypothetical," Ms. Bryars opined there were such jobs—listing a meat clerk, store laborer and merchandise marker as three jobs falling within those parameters (Tr. 72–73). She

further stated that her conclusions were consistent with the *Dictionary of Occupational Titles* ("DOT") (Tr. 73).[3]

When asked about the tolerance for absenteeism in these jobs, Ms. Bryars stated that one to two "unscheduled and/or unexcused absences … per month, [which] would include arriving late or leaving early" would be tolerated (Tr. 73). When asked to assume the hypothetical person was unable to work with supervisors or coworkers without exhibiting behavioral extremes, such as getting angry, yelling at people or walking off the job two to three times per month, Ms. Bryars said these jobs would not tolerate such behavior. (*Id.*) When asked to assume the hypothetical person was unable to maintain concentration, persistence or pace for two-hour segments, and would be off task for 15% of an eight-hour workday, Ms. Bryars opined, "that would eliminate all competitive work." (Tr. 73–74.)

### d. The ALJ's Decision

In reaching his decision the ALJ followed the five-step sequential analysis established under the regulations. These steps require the ALJ to make a series of factual findings regarding the claimant's impairments, residual functional capacity, age, education and work experience. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see also Locher v. Sullivan*, 968 F.2d 725, 727 (8th Cir. 1992). The Eighth Circuit has described this five-step process as follows:

> The Commissioner of Social Security must evaluate: (1) whether the claimant is presently engaged in a substantial gainful activity; (2) whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations; (4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.

---

[3] *See Dictionary of Occupational Titles*, 1991 WL 645958 (4th ed. 1991).

*Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003).

With respect to steps one through three, the ALJ determined that Plaintiff has not engaged in substantial gainful activity since October 28, 2019, the amended onset date (Tr. 26); that Plaintiff has severe mental health impairments,[4] including "headaches due to traumatic brain injury; mild neurocognitive disorder due to traumatic brain injury; ADHD; major depressive disorder, mild; impulse control disorder; adjustment disorder; unspecified anxiety disorder, anti-social personality disorder; [and] unspecified stimulant use disorder (alcohol and methamphetamine)" (*id.*); and that Plaintiff does not have a severe impairment or combination of impairments that equals the severity of one of those listed in 20 C.F.R. §§ 416.920(d), 416.925 and 416.926 (Tr. 27). Plaintiff does not challenge the ALJ's findings in connection with these first three steps in the analytical process.

The ALJ reached the following determination with respect to Plaintiff's MRFC at step four:

> [Plaintiff] must avoid exposure to loud and very loud background noises (as those terms are defined in the SCO) due to headaches. Mentally, [he] retains the ability to understand, remember and carry out short, simple and repetitive instructions, sustain concentration, persistence and pace for a period of two hours at a time for such level of instructions over an 8-hour workday (with normal breaks), interact with supervisors and co-workers *up to an occasional basis* but should not have any customer service interaction with the public, make judgments on simple work related-decisions and respond appropriately to infrequent and gradual workplace changes in a routine work setting.

(Tr. 28–29) (emphasis added).

In reaching this conclusion, the ALJ extensively recapped Plaintiff's medical history and hearing testimony (Tr. 29–34). He noted the following findings cut against Plaintiff's claim of total disability: (1) his lack of emergency room history with respect to headaches; (2) his neurological testing demonstrating generally average to bright scores, except for his verbal

---

[4] The ALJ's findings with respect to Plaintiff's physical impairments are not at issue in this action.

comprehension and attention scores; and (3) his documented mental health improvement with counseling, compliance with treatment recommendations and mental status examination (Tr. 32). The ALJ further concluded that Plaintiff's testimony about his day-to-day activities cut against any claim that his attention span rendered him unable to work. (*Id.*) Additionally, Plaintiff's expressed unwillingness to work and his lack of effort to seek job retraining weighed against the probative weight of his allegations. (*Id.*)

With respect to medical evidence, the ALJ noted that he would "not defer or give any specific evidentiary weight, including controlling weight to any prior administrative medical finding(s) or medical opinion(s)[.]" (Tr. 34.) However, the ALJ found the Psychological Consultants' assessments, limiting Plaintiff "to unskilled work activity with reduced contact with others to be persuasive." (*Id.*) He further found their determinations were generally consistent with treatment notes and neuropsychological testing. (*Id.*) The ALJ ultimately concluded at step four that Plaintiff does not have the residual functional capacity to perform past relevant work (Tr. 35).

Finally, at step five, the ALJ found there are other jobs in the national economy to which Plaintiff could adjust (Tr. 35-36). Relying on Ms. Bryar's testimony at the administrative hearing, the ALJ determined Plaintiff could perform the jobs of meat clerk, store laborer, or merchandise marker, and that these jobs existed in significant numbers in the national economy. Based on these findings, the ALJ concluded Plaintiff is not disabled (Tr. 36).

V.    **Standard of Review**

Judicial review of the Commissioner's denial of benefits is limited to determining whether substantial evidence on the record as a whole supports the decision, 42 U.S.C. § 405(g), or whether the ALJ's decision resulted from an error of law. *Nash v. Comm'r, Soc. Sec. Admin.*, 907 F.3d

1086, 1089 (8th Cir. 2018) (citing 42 U.S.C. § 405(g); *Chismarich v. Berryhill*, 888 F.3d 978, 979

(8th Cir. 2018)).  "Substantial evidence is less than a preponderance, but enough that a reasonable

mind would find it adequate to support the Commissioner's conclusions." *Id.* (quoting *Travis v.

Astrue*, 477 F.3d 1037, 1040 (8th Cir. 2007)).  The Supreme Court explained:

> The phrase "substantial evidence" is a "term of art" used throughout administrative
> law to describe how courts are to review agency factfinding.  Under the substantial-
> evidence standard, a court looks to an existing administrative record and asks
> whether it contains sufficient evidence to support the agency's factual
> determinations.  And whatever the meaning of "substantial" in other contexts, the
> threshold for such evidentiary sufficiency is not high.  Substantial evidence ... is
> more than a mere scintilla.  It means—and means only—such relevant evidence as
> a reasonable mind might accept as adequate to support a conclusion.

*Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019).  "[The] Court considers evidence that detracts

from the Commissioner's decisions, as well as evidence that supports it." *Nash*, 907 F.3d at 1089

(quoting *Travis*, 477 F.3d at 1040).  "If substantial evidence supports the Commissioner's

conclusions, [the] Court does not reverse even if it would reach a different conclusion, or merely

because substantial evidence also supports the contrary outcome." *Id.* (quoting *Travis*, 477 F.3d

at 1040).  In other words, "if it is possible to draw two inconsistent positions from the evidence

and one of those positions represents the [Commissioner's] findings, [the Court] must affirm the

decision." *Chesser v. Berryhill*, 858 F.3d 1161, 1164 (8th Cir. 2017) (quoting *Cruz v. Chater*, 85

F.3d 1320, 1323 (8th Cir. 1996)).

A claimant has the burden to prove disability. *See Roth v. Shalala*, 45 F.3d 279, 282 (8th

Cir. 1995).  The claimant must establish that he is unable "to engage in any substantial gainful

activity by reason of any medically determinable physical or mental impairment which can be

expected to result in death or which has lasted or can be expected to last for a continuous period

of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The disability, not just the impairment,

must have lasted or be expected to last for at least twelve months. *Barnhart, v. Walton*, 535 U.S.

212, 217-22 (2022); *see also*, *Titus v. Sullivan*, 4 F.3d 590, 594 (8th Cir. 1993).

**VI.    Analysis**

For the reasons set forth in greater detail below, the ALJ's decision is subject to several conflicting interpretations, such that the grounds on which the ALJ ultimately concluded Plaintiff is not disabled are not entirely clear.  It is a "foundational principle of administrative law that judicial review of agency action is limited to the grounds the agency invoked when it took the action." *Dept. of Homeland Sec. v. Regents of the Uni. of California*, 140 S.Ct. 1891, 1907 (2020) (quoting *Michigan v. EPA*, 576 U.S. 743, 758 (2015)).  Those "grounds upon which the agency acted [must be] clearly disclosed and adequately sustained." *SEC v. Chenery*, 318 U.S. 80, 94 (1943) ("*Chenery I*").  Thus, the agency must make "all necessary determinations of fact or policy" in the first instance, *Banks v. Massanari*, 258 F.3d 820, 824 (8th Cir. 2001), and must provide a sufficient explanation for its decision to allow for meaningful review on appeal.  *See, e.g.*, *Christine F. v. Kijakazi*, 21-cv-2048-NEB-LIB, 2022 WL 3648674, at *5 (D. Minn. July 27, 2022), *report and recommendation adopted*, 2022 WL 3647808 (D. Minn. Aug. 24, 2022). "It will not do for a court to be compelled to guess at the theory underlying the agency's action; nor can a court be expected to chisel that which must be precise from what the agency has left vague and indecisive." *SEC v. Chenery Corp.*, 332 U.S. 194, 196–97 (1947) ("*Chenery II*").  To be sure, "a deficiency in opinion writing is not sufficient to set aside an ALJ's findings[] where the deficiency has no practical effect on the outcome of the case, [but] inaccuracies, incomplete analyses, and unresolved conflicts of evidence can serve as a basis to remand." *Draper v. Barnhart*, 425 F.3d 1127, 1130 (8th Cir. 2005) (quotation omitted).  If the grounds of decision are inadequate, on remand, "the agency may offer a fuller explanation of the agency's reasoning at the time of the

14

agency action (but without providing new reasons for the decision), or deal with the problem afresh by taking a new agency action." *Regents of the Uni. Of California*, 140 S. Ct. at 1907–1908.

Here, the Court is unable to discern from the ALJ's decision his rationale for including in Plaintiff's MRFC a limitation to "occasional" contact, but omitting any explicit limitation to "superficial" contact. Furthermore, because this deficiency could have an impact on the outcome of the case, the Court recommends this matter be remanded to the agency for further review and clarification.

### A.    The ALJ's Decision Does Not Permit Meaningful Review.

The crux of Plaintiff's argument for summary judgment is that in reaching his MRFC determination the ALJ failed to properly consider the state Psychological Consultant's findings, on initial review and on reconsideration, that Plaintiff can only engage in "superficial interactions" with others (ECF No. 18). Plaintiff asserts the ALJ erroneously ignored the distinction between "superficial" and "occasional" interactions, and that this mistake constitutes reversible error. Plaintiff points out that the ALJ found he could "interact with supervisors and coworkers up to an *occasional basis* but should not have any customer service interaction with the public" (Tr. 28-29) (emphasis added); whereas the Psychological Consultants, Dr. Sargeant and Dr. Feil, both found he was limited to "*superficial* interactions with supervisors, coworkers and the public." (Tr. 107, 130) (emphasis added). According to Plaintiff, because the ALJ specifically found the psychologists' findings persuasive with respect to unskilled work activity and reduced contact with others (*see* Tr. 34), but he did not address why he incorporated an "occasional" rather than "superficial" contact limitation into the RFC analysis, he committed reversable error requiring remand (ECF 18 at 12–14).

In his Supplemental Motion for Summary Judgment and Motion for Remand, Plaintiff points to the Appeals Council's decision in *In Re Paul* (ECF No. 26) as additional support for this claim.  (*See* ECF Nos 25, 32.)  In that case, the Psychological Consultants similarly determined that the petitioner could engage only in "occasional, superficial" interaction with others.  The ALJ found the consultants' opinions "mostly persuasive" but rejected the "superficial interaction" limitation on the ground that "superficial interaction" is not a "vocationally proper term." (*Id.* at 3–4.) The Appeals Council found the ALJ had erred and remanded, explaining that:

> '[S]uperficial interaction' is a term that is readily defined, understood and applicable to a work setting, as it speaks to the depth, kind and quality of social interactions, and indicates that the claimant could not have sustained more than shallow or cursory interactions with others, i.e., coworkers, the general public, and/or supervisors. This term is distinguishable and distinct from "occasional" which describes the frequency of interaction with others and how much interaction the claimant could tolerate on a sustained basis.

Plaintiff argues *In Re Paul* is dispositive because it established a new, broadly applicable interpretation of the word "superficial," which the ALJ improperly omitted from his analysis of Plaintiff's claim.  (*See* ECF No. 32 at 3–4.)

The Commissioner initially argued in response to Plaintiff's motion that the ALJ chose not to incorporate a superficial interaction limitation into his determination of Plaintiff's MRFC based on his review of the whole record, and that this decision was supported by substantial evidence (ECF No. 20 at 6–7) ("[W]hile the ALJ found persuasive the state agency medical consultants' findings that Plaintiff could perform a range of unskilled work, the ALJ was not required to adopt their opinions wholesale."). The Commissioner's opening position thus was that the ALJ did not find the psychologists' limitation to "superficial" contact to be a persuasive one.

The Commissioner inconsistently argued, on supplemental briefing, that the ALJ effectively *did* incorporate a superficial interaction limitation into his analysis by including in

Plaintiff's MRFC a limitation to unskilled work. According to the Commissioner, there is no distinction between an MRFC limiting Plaintiff to occasional interactions with coworkers and supervisors in the context of unskilled work, and an MRFC limiting Plaintiff to superficial interactions with supervisors and coworkers. (*See* ECF No. 30 at 5–6, asserting the distinction between a superficial interaction limitation and an occasional interaction limitation in the context of unskilled work is "nonexistent".)

The Commissioner further contends that the three jobs the ALJ identified at step five as jobs to which Plaintiff could adjust—meat clerk, store laborer, and merchandise marker—all incorporate a superficial contact limitation. The Commissioner explains that the DOT rates interactions with people on a scale of 1–8, with level 1 requiring the most complex interaction, and level 8—"Taking Instructions-Helping"— requiring the least complex interactions. (ECF No. 30 at 7, citing *DOT*, App'x B, 1991 WL 688701.) The DOT also separates jobs on a binary scale, on which "S" represents significant interactions and "N" represents insignificant interactions. Each job the ALJ identified, based on the vocational expert's input, has an "N" and 8 rating. (*See id.*) Additionally, all the identified jobs require a reasoning level of "2," requiring the employee to carry out "detailed but uninvolved written or oral instructions" and "[d]eal with problems involving a few concrete variables in or from standardized situations." (*See id.*) According to the Commissioner's analysis, because an individual who cannot engage in more than superficial contact can work in these jobs, the ALJ's MRFC limitation implicitly incorporated a superficial contact limitation. (*Id.* at 7–8.)

The ALJ's rationale is unclear, but his decision suggests he likely equated "superficial" and "occasional" interaction as synonymous terms. It is noteworthy that the Psychological Consultants' assessments limiting Plaintiff "to unskilled work activity with reduced contact with

others" were among the few medical opinions the ALJ explicitly found "persuasive." (Tr. 34.) Since the Psychological Consultants described "superficial contact" and not "reduced contact", but the ALJ's MRFC assessment describes "occasional contact," the language in the ALJ's decision suggests he may have equated "reduced contact," "superficial contact," and "occasional contact" as synonymous phrases. But since the ALJ did not give **controlling weight to any prior administrative medical findings or opinions** (*see id.*), it is also possible he simply chose not to **adopt the "superficial" contact limitation, as the Commissioner argued in his initial response.** It is also possible, as the Commissioner argued in his supplemental response, that the ALJ equated "superficial contact" with "occasional contact in the context of unskilled work." Ultimately the Court finds that any one of the three conflicting interpretations of the ALJ's decision offered by the parties is potentially correct. Which interpretation reflects the rationale the ALJ actually applied is not clearly discernable, however. Based on this record, the Court concludes the grounds provided for the ALJ's decision are inadequate to permit meaningful review.

### B. The Deficiency is Outcome-Determinative.

The Court need not remand this matter if the ALJ's failure to explain the rationale for his omission of an explicit limitation to superficial contact would have no impact on the outcome of the case. *See Draper*, 425 F.3d at 1130. But for the reasons that follow, the Court finds this failure is potentially outcome-determinative and necessitates a remand.

### 1. "Superficial" and "occasional" contact are not synonymous.

The Court agrees with the recent decision in *Troy L. M. v. Kijakazi*, No. 22-cv-119-TNL, 2022 WL 4540107, at *14-15 (D. Minn. Sept. 28, 2022), holding that there is a material difference between a superficial contact and an occasional contact limitation. Occasional contact describes the quantity of time spent with individuals, while superficial contact describes the quality of the

interactions. *See, e.g., id.* at \*14-15; *see also Titles II & XVI: Determining Capability to Do Other Work—The Medical-Vocational Rules of Appendix 2*, SSR 83-10, 1983 WL 31251, at \*5 (Soc. Sec. Admin. Jan. 1, 1983) (defining "occasionally" as "occurring from very little up to one-third of the time"). Moreover, contrary to Plaintiff's characterization of *In Re Paul* as a watershed case, courts have recognized this distinction for quite some time. *See Troy L. M.*, 2022 WL 4540107 at \*14 (collecting cases); *Sanders v. Astrue*, No. 11-cv-1356-JNE-JJG, 2012 WL 1657922, at \*12 (D. Minn. April 17, 2012) ("Even a job that requires only occasional interaction could require an employee to engage in prolonged or meaningful conversations during those few occasions."), *report and recommendation adopted in relevant part and rejected in part*, 2012 WL 1658988 (D. Minn. May 11, 2012); *Eden v. Comm'r of Soc. Sec.*, 18-cv-0076, 2019 WL 7666532, at \*2 (N.D. Ia. June 6, 2019) (collecting cases); *Redd v. Comm'r of Soc. Sec.*, 20-cv-222, 2021 WL 1960763, at \*4 (W.D. Mich. May 17, 2021) (collecting cases); *Wood v. Comm'r of Soc. Sec.*, 18-cv-76, 2019 WL 1614591, at \*3 (S.D. Ohio Apr. 16, 2019), *report and recommendation adopted*, 2019 WL 1958663 (May 2, 2019); *Hurley v. Berryhill*, 17-cv-421, 2019 WL 1614591, at \*4 (N.D. Ia. Sept. 5, 2018). Thus, to the extent the ALJ based his decision on the assumption that "superficial" and "occasional" contact are indistinguishable, that decision was based on an error of law.

### 2.    There is insufficient evidence to conclude the error was harmless.

The Court need not remand if the potential error in the ALJ's analysis was harmless. *See Byes v. Astrue*, 687 F.3d 913, 917-18 (8th Cir. 2012) (explaining that when the ALJ errs but the error is harmless, no remand is warranted); *see also, e.g., Grindley v. Kijakazi*, 9 F.4th 622, 629 (8th Cir. 2022) (reiterating that the harmless error rule is applicable to social security administrative appeals). For an error to be harmless, it must not prejudice the party alleging the error. *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009).

The Commissioner argues that, to the extent the ALJ erred by conflating "superficial" with "occasional" contact, the error was harmless.   The Commissioner's briefing raises two related but distinct theories.

First, the Commissioner asserts that the ALJ impliedly incorporated "superficial" contact into his analysis by adding an unskilled work limitation, since there is no distinction between an MRFC limiting Plaintiff to occasional interactions with coworkers and supervisors in the context of unskilled work, and an MRFC limiting Plaintiff to superficial interactions with supervisors and coworkers.  As discussed above, the ALJ's written decision is insufficiently clear to conclude that this is in fact the rationale he applied.  But if the Commissioner is correct and there is no such distinction, then regardless of the rationale the ALJ actually applied, the error would be harmless since the hypothetical presented to the vocational expert included limitations to "unskilled" work and "occasional" interactions with supervisor and co-workers.  (Tr. 71-72.)  *See, e.g., Reid v. Colvin*, 2:14-cv-04295-MDH, 2016WL 502063, at *3 (W.D. Mo. Feb. 8, 2016) (error is harmless when the ALJ poses a hypothetical to the vocational expert that addresses the limitations that were excluded from the residual functional capacity).

The Commissioner cites two authorities for the proposition that occasional interaction in the contact of unskilled work is equivalent to superficial interaction (ECF No. 30 at 6-7), but neither of them supports the conclusion that these terms necessarily are equivalent.  *See* 20 C.F.R. § 416.968(a) (defining "unskilled work" as "work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time," but including no limitation to superficial contact); SSR 85-15, 1985 WL 56857, at *4 (stating that unskilled work deals "primarily" with objects rather than data or people, but not excluding occasional, significant

interactions with supervisors). Lacking any authority on point to support the Commissioner's position, the Court is unpersuaded that these terms define the same concepts.

Second, according to the Commissioner, the three jobs the ALJ ultimately found Plaintiff capable of performing—meat clerk, store laborer and marker—all only require superficial contact with others, such that Plaintiff could not have been prejudiced. *See, e.g., Caudle v. Colvin*, 13-cv-5312, 2015 WL 1886863, at *7 (W.D. Ark. Apr. 24, 2015) (finding ALJ's failure to incorporate certain limitations in the residual functional capacity was harmless error when the jobs identified by the ALJ included such limitations). Although the Commissioner's characterization of the three jobs at issue here is plausible, and the ALJ ultimately may reach the same conclusion on remand, the Court finds insufficient evidence in the present administrative record to conclude these jobs necessarily incorporate a superficial contact limitation. In reaching his determination at step 5 that Plaintiff is capable of making a successful adjustment to these three jobs, the ALJ relied heavily on the testimony of Ms. Bryars, the vocational expert (Tr. 36). But Ms. Bryars' testimony was based on the ALJ's hypothetical, which incorporated his potential error of law by describing an individual who is limited to "occasional" interactions with supervisors and coworkers. (Tr. 71.) "The ALJ may only rely upon the testimony of the VE where the ALJ offers a *properly phrased* hypothetical to the VE, and the VE testifies in response to that hypothetical." *Holley v. Astrue*, 4:08-CV-04010, 2008 WL 5381313, at *4 (W.D. Ark. Dec. 22, 2008) (emphasis in original) (citing *Page v. Astrue*, 484 F.3d 1040, 1045 (8th Cir. 2007)). Since the testimony on which the ALJ relied at step five is based on a potentially flawed hypothetical, the Court cannot conclude from Ms. Bryars' testimony that the error was harmless.

Moreover, the Court is unpersuaded by the Commissioner's argument that the jobs of meat clerk, store laborer and merchandise marker necessarily require only superficial contact with

supervisors and co-workers because of the manner which the DOT categorizes them. The Commissioner points out that the DOT rates these jobs as 8 "Taking Instructions-Helping" and "N" insignificant. While it is entirely possible the ALJ would equate these terms with "superficial" interaction, the ALJ's decision does not address this question and the Commissioner cites to no authority defining these terms as necessarily equivalent. *See Troy L. M.*, 2022 WL 4540107, at *16 (remanding when ALJ failed to explain why he did not incorporate a superficial contact limitation into the RFC when the jobs the VE identified, which the ALJ relied upon in his opinion, had 8 "Taking Instructions-Helping" and "N" insignificant ratings); *Christine F.*, 2022 WL 3648674, at *5 n.4 (rejecting the Commissioner's harmless error argument where "it [was] unclear from the description of the jobs in the Dictionary of Occupational Titles that these jobs do not require more than brief, superficial interactions). For these reasons, the Court concludes more development of the record is necessary to permit meaningful review of the ALJ's rationale and recommends that this case be remanded. On remand the ALJ would be free to adopt or to reject the Psychological Consultants' finding that Plaintiff is limited to "superficial contact" with others, to obtain new testimony from the vocational expert based on a hypothetical that incorporates this limitation, or to simply explain whether, in his analysis, the three jobs previously identified at step five require only superficial contact with supervisors and co-workers.

## RECOMMENDATION

Based on the foregoing, and on all of the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED THAT**:

1.  Plaintiff's Motion for Summary Judgment (ECF No. [17]) and Supplemental Motion for Summary Judgment (ECF No. [31]) be **DENIED**;

2.      Defendant's Motion for Summary Judgment (ECF No. [19]) and Supplemental

Motion for Summary Judgment (ECF No. [29]) be **DENIED**; and

3.      Plaintiff's Motion to Remand (ECF No. [24]) be **GRANTED**.

Dated: January 27, 2023                          *s/ Dulce J. Foster*
                                                  Dulce J. Foster
                                                  United States Magistrate Judge

## <u>NOTICE</u>

**Filing Objections:**  This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections.  *See* Local Rule 72.2(b)(2).  All objections and responses must comply with the word or line limits set forth in Local Rule 72.2(c).